STATE OF MONTANA, PLAINTIFF AND RESPONDENT, v. PORTUS FRANK WINTER, DEFENDANT AND APPELLANT.

No. 9431.

Submitted November 5, 1954. Decided June 9, 1955.

285 Pac. (2d) 149

Seth F. Bohart, Bozeman, for appellant.

Arnold H. Olsen, Atty. Gen., Harold L. Allen, County Atty., Bozeman, H. J. Luxan, Special Asst. Atty. Gen. for respondent.

Mr. Bohart, Mr. Olsen, Mr. Allen and Mr. Luxan argued orally.

MR. CHIEF JUSTICE ADAIR:

Portus Frank Winter was accused, tried by a jury, convicted and sentenced in the district court of Gallatin County, Montana, for selling beer to a seventeen-year old boy. This appeal is from the judgment of conviction and order denying Winter a new trial.

By information filed in the district court of Gallatin County, Montana, the defendant, Portus Frank Winter, was accused of the crime of misdemeanor in that said defendant, at Karst's Kamp on Highway 191 near Gallatin Gateway, in the County of Gallatin, State of Montana, on or about the 8th day of May 1953, did unlawfully sell to a specifically named boy then ''a minor of the age of seventeen (17) years, one bottle of beer All of which is contrary to the form, force and effect of the

statute in such case, made and provided and against the peace and dignity of the State of Montana.'' The information was signed by the county attorney and had the names of six witnesses for the state endorsed thereon.

The defendant Winter, accompanied by his counsel, appeared in open court,—waived the reading of the above information, a true copy whereof was then and there delivered to him—waived time in which to plead and entered a plea of not guilty.

Thereafter on duly noticed motion of the county attorney, over defendant's objections and after hearing oral arguments of counsel for both the state and the defendant thereon, the district court granted leave to endorse upon the information the name of Peter Karst as an additional witness for the state and also granted leave to amend the information by writing and inserting after the word ''beer'' and before the word ''All'' in the above quoted portion of the information the following italicized words, namely: *''the said Portus Frank Winter being then and there an employee of Peter F. Karst, said Karst being then and there a retail beer dealer licensed under the laws of the State of Montana.''*

Defendant specified as error the action of the court in allowing the above amendments. The amendments were made well in advance of the trial. They caused no delay of the trial. There is no evidence of any bad faith on the part of the county attorney,—the defendant suffered no prejudice therefrom and we find no abuse of discretion on the part of the trial judge in allowing the amendments. R. C. M. 1947, section 94-6207; State v. Calder, 23 Mont. 504, 507, 59 Pac. 903; State v. Biggs, 45 Mont. 400, 403, 123 Pac. 410; State v. Harkins, 85 Mont. 585, 281 Pac. 551.

''Any person who shall sell, give away or dispose of intoxicating liquors to any person under the age of twenty-one (21) years'' commits an offense and violates the law, R. C. M. 1947, section 94-35-106, and the phrase ''intoxicating liquor'' includes beer, R. C. M. 1947, section 94-35-107. It matters not whether the defendant Winter was employer or employee,—whether he

worked for Peter F. Karst or anyone else,—whether he or Karst or anyone else had a retail beer license,—whether he was winter keeper, horse wrangler, watchman, bartender, guest or intruder, the fact remains that both before and after the amendment of the information Winter was a person and the one and only person accused of the offense of selling beer to the named minor being the one and only offense charged. Clearly the information was sufficient both before and after its amendment. We consider the added italicized words to be mere surplusage. Compare State v. Gaffney, 106 Mont. 310, 312, 77 Pac. (2d) 398; 42 C. J. S., Indictments and Information, section 250, page 1266, and cases cited including State v. Finley, 72 Mont. 42, 46, 231 Pac. 390; Commonwealth Public Service Co. v. City of Deer Lodge, 96 Mont. 15, 21, 28 Pac. (2d) 472; Fitzpatrick v. Stevenson, 104 Mont. 439, 444, 67 Pac. (2d) 310; People v. McInerney, 30 Cal. App. 283, 158 Pac. 128.

The defendant interposed a demurrer to the information as amended, urging as grounds that it appears from the face thereof: (1) That the district court has no jurisdiction of the offense charged; (2) that the amended information does not substantially conform to the requirements of R. C. M. 1947, sections 94-6403, 94-6404 or 94-6405; (3) that more than one offense is charged therein; (4) that the facts therein stated do not constitute a public offense and (5) that the amended information contains matter which, if true, constitutes a legal bar to the prosecution. After a hearing had thereon the defendant's demurrer was disallowed.

Defendant contends that the amended information is insufficient in that it fails to allege the percentage of the alcohol in the beer which he is accused of having sold to the minor but we find no merit in the contention. R. C. M. 1947, section 94-35-107, defines "intoxicating liquor" and it includes beer without stating the percentage of alcohol therein. Under the provisions of R. C. M. 1947, section 94-35-106, the amended information was sufficient without alleging the percentage of the alcohol in the beer sold. Compare 30 Am. Jur., Intoxicating

Liquors, section 382, page 460; Welsh v. State, 126 Ind. 71, 25 N. E. 883, 9 L. R. A. 664; State v. Sedlacek, 74 Mont. 201, 205, 239 Pac. 1002; State v. Miller, 69 Mont. 1, 220 Pac. 97.

Following the overruling of defendant's demurrer the case came on for trial at the outset whereof the defendant again challenged the sufficiency of the information as amended by objecting to the introduction of any evidence urging all the grounds theretofore urged in his demurrer. The objections were overruled and the cause proceeded to trial before the court and a jury.

Six witnesses were called and testified on behalf of the state and the state rested its case in chief whereupon defendant's counsel moved for a directed verdict grounded upon the claimed insufficiency of the state's evidence which motion was denied.

After calling and examining three witnesses the defendant rested his case and the court then proceeded to settle the instructions.

Defendant specifies as error the giving, over his objections, of the court's instruction No. 26 which reads:

"You are instructed that under the law of the State of Montana any person who shall sell, give away or dispose of intoxicating liquor to any persons under the age of twenty-one (21) years, shall for the first offense be subject to punishment not exceeding five hundred dollars ($500.00) fine or by imprisonment not to exceed six (6) months in the county jail, or by both such fine and imprisonment * * *''

The above is merely a statement of those provisions of section 1 of Chapter 143, Laws of 1949 (now R. C. M. 1947, section 94-35-106, Vol. 8, Cumulative Pocket Supplement to Revised Codes of 1947) pertinent to this particular case. Defendant objected to the instruction upon the ground "that the State of Montana has heretofore set forth the prosecution was under the provisions of Section 4-330, as amended by Chapter 166, Session Laws of 1951, that that was the law then and there applicable on the 8th day of May, 1953; that this is an attempt to define the first time punishment in an offense under a different

statute; it's in violation of the Constitutional rights and Statutory rights guaranteed to a defendant by the Laws of the State of Montana.''

Instruction No. 26, supra, correctly states the law here applicable and the trial court's ruling disallowing defendant's objections was correct.

After being instructed by the court,—hearing the arguments of counsel and considering the evidence, the jury returned its verdict finding the defendant guilty and leaving his punishment to the court. Defendant's counsel thereupon interposed a motion in arrest of judgment which motion was disallowed and defendant was sentenced to serve 15 days in the county jail and to pay a $500 fine.

Defendant made a motion for a new trial which was disallowed whereupon he appealed to this court listing and arguing nineteen separately numbered specifications of error.

Defendant here contends that the trial court committed error: (1 and 15) In allowing the amendment of the information; (2) in disallowing defendant's objection to the introduction of any evidence in the case; (3) in overruling the demurrer to the amended information; (4) in denying defendant's motion for dismissal of the case made at the close of all the state's evidence; (5) in disallowing defendant's motion in arrest of judgment; (6) in refusing to grant a new trial; (7) in ruling that the district court had jurisdiction of the offense charged; (8, 9 and 14) in allowing defendant's prosecution and in sustaining his conviction; (10 and 11) in pronouncing sentence on defendant under R. C. M. 1947, section 94-35-106, as amended and (12 and 13) in giving the court's instruction No. 26, supra. Finally in his specifications Nos. 16, 17, 18 and 19 the defendant contends that the verdict rendered by the jury in his case was contrary to: (a) the law; (b) the court's instructions and (c) the evidence, and (d) that such verdict was based upon conjecture, surmise, bias and prejudicial statements and evidence *aliunde* the record.

*State's Evidence.* The state's evidence is undisputed. It is to the following effect.

Friday, May 8, 1953, was what is known as "Ditch Day" in the Gallatin County High School at Bozeman and it was observed by members of the senior class with a class picnic held at Old Faithful in Yellowstone National Park. On the way home from such picnic four teen-aged boys stopped their automobile at Karst's Kamp on highway 191 in Gallatin County.

At that time the state's witness, Peter F. Karst, was the owner of said Karst's Kamp where he engaged in the retail beer and liquor business pursuant to the authority conferred upon him by retail beer license No. 839 and retail liquor license No. 839 issued to him by the Montana state liquor control board for the fiscal year commencing July 1, 1952, and ending July 30, 1953.

One of the buildings at Karst's Kamp housed a coffee shop, —a dining room and a kitchen. In the coffee shop and at the rear thereof was the Karst Kamp bar. Upon walking into the building from highway No. 191, one would first enter the combination coffee shop and bar,—next the dining room and finally the kitchen.

Upon leaving their automobile the four high school students walked through the coffee shop to the rear thereof where they observed the defendant Portus Frank Winter behind the bar.

The witness Peter F. Karst testified that at the time the youths drove up the witness Karst was about two or more hundred feet away from the building housing his bar; that he was then engaged in cutting and piling wood and that he saw the youths stop. Karst testified: "They said they wanted some sandwiches and they went in the building; they did, yes."

Upon entering the building three of the boys stopped at the bar where they were served beer by the defendant Portus Frank Winter.

The fourth youth, being the driver of the automobile in which all were travelling, walked past the bar and into the kitchen where he ordered and obtained a ham sandwich. Upon being handed the sandwich he returned to the bar where he ate it and

214

where he observed the other three boys "having their beer on the bar." He testified: "I went in there and ate my sandwich and they wanted one so I went back to the kitchen and got them one. * * * I was in the kitchen most of the time. They said they'd like one. I think I asked them if they wanted one."

On further questioning the witness testified:

"Q. Do you know Mrs. Karst? A. Yes. I have seen her.

"Q. Did you see her and talk to her? A. She brought—she was in the kitchen and I talked to her for a minute when I got the sandwiches.

"Q. Did you see any of the other boys talking to her? A. If I recall she came out when we were sitting there before we got ready to leave.

"Q. Do you remember them visiting quite a bit with her? A. Just talking with her.

"Q. Wasn't anybody else around to visit with was there? A. There was two or three other people there but I think on the other side or other part of the bar.

"Q. Strangers? A. Strangers to me."

The minor named in the information as the one to whom the defendant Winter is accused of having sold beer on May 8, 1953, testified that he was born May 15, 1935; that on the day charged in the information he and his three classmates were in the bar at Karst's Kamp at which time and place the defendant Winter sold and served beer to him.

The record of his testimony at the trial is, in part, as follows:

"Q. * * * were you at the Karst Ranch or Kamp in Gallatin Canyon, in Gallatin County, situated right off Highway No. 191, on the 8th day of May, 1953? A. I was. * * *

"Q. Did you at that time and place go within the bar premises at the Karst Kamp? A. Yes, we did.

"Q. Did you see a man there at or near the bar? A. Yes.

"Q. Did you—Was he at any time on that date behind the bar? A. Yes.

"Q. And do you know who that man was? A. Yes.

"Q. Who was he? A. It was Portus Winters.

"Q. Do you see Portus Winters in the courtroom? A. Yes.

\* \* \*

"Q. \* \* \* did you have any beer at the Karst bar, the place where you have just mentioned in your testimony? A. Yes.

"Q. On the 8th day of May, 1953? A. Yes.

"Q. And how did you obtain that beer? A. I just asked for it and paid for it.

"Q. Who did you ask for the beer \* \* \*? A. Mr. Winter.

"Q. And Mr. Winter served you the beer then, did he? A. Yes.

"Q. And you paid him for the beer? A. Yes, I did. \* \* \*

"Q. \* \* \* had you seen Mr. Winter before that day? A. Yes, I had.

"Q. About what time was that? A. Oh. I don't know, I'd been up there two or three times before.

"Q. Had you had conversations with Mr. Winter prior to the 8th of May, 1953? A. Yes."

The testimony of the above witness was fully corroborated by that of his three companions, each of whom appeared and testified as witnesses for the state. Each testified that at the time in question he was a minor. Each testified that the driver of the automobile in which all were travelling drank no beer but that on May 8, 1953, each of the other three obtained beer at the Karst Kamp bar from the defendant Winter who was the bartender there at that time.

At the trial the youth who drove the automobile pointed out the defendant Winter as the man he saw tending bar when the boys entered the tavern on May 8, 1953, and he testified that he there observed the other three boys having their beer on the bar.

The defendant Winter did not take the witness stand nor was any evidence introduced that in wise or manner refutes or contradicts the proof so submitted by the state.

The evidence stands undisputed that on the day charged the defendant did sell beer to the minor named in the information.

Thereby did defendant violate R. C. M. 1947, sections 94-35-106 and 94-35-106.1.

The record shows that at the trial the state's witness Peter F. Karst, in part, testified:

"Q. And on May 8, 1953, you were a licensed beer retailer at the Karst Kamp in Gallatin County, is that right? A. Yes, sir; that's right.

"Q. Mr. Karst, were you at the Karst Kamp on May 8, 1953? A. Yes. I was there.

"Q. Did you have in your employ on that day one Portus Frank Winter? A. Well, he was there but he was not employed at the time.

"Q. Mr. Karst, was he doing any work about your premises at the Karst Kamp on May 8, 1953? A. Well, he had his own business to tend to but whatever there was done, why, he would do. * * *

"Q. Mr. Karst, you have testified that whatever there was done he would do. What were those things? A. Well, that was hard to tell. He was winter keeper up there and took care of his own business. I was gone a good deal of the time.

"Q. Mr. Winter was a winter keeper? A. Yes.

"Q. What is involved in the work of a winter keeper? A. Well, there wasn't anything involved excepting that people come along and wanted gas, why, there was somebody there to take care of it.

"Q. That was at your camp, the Karst Ranch? A. That's right.

"Q. You had a gas pump there did you, sir? A. Yes.

"Q. And if he sold any gas that would be for you would it? A. Yes.

"Q. How long, Mr. Karst, did Mr. Winter serve at the Karst Kamp as winter keeper with reference to the— A. Well, we had made kind of a proposition by which he would be the winter keeper and he started right after the hunting season and kept on through until the 1st of June. * * *

"Q. Mr. Karst, did Mr. Winter have a right to be in and

about other premises besides the gas pump? A. Why, yes, he had access to all of the buildings at that time to take care of them or to look after them. Whatever happened, in case of fire or robbery or something like that.

"Q. That was likewise at the Karst Kamp was it? A. Yes, sir.

"Q. Mr. Karst, when you say he had access to all of the buildings, would that include the bar premises that you say you conducted at the Karst Kamp? A. Yes.

"Q. He had a right to be there too? A. Oh, yah.

"Q. Mr. Karst, did he, did Mr. Winter act as your bartender during that period of time sometimes?

"Mr. Bohart: To which I object upon the ground and for the reason that this is incompetent, irrelevant and immaterial; the proper foundation has not been laid.

"The Court: Overruled.

"Q. You may answer? A. Well, you know, he'd do whatever there was to do. If there was anything around there to do, why, he'd do it as it happend. I wasn't there. Whenever somebody comes, why, he would be there and take care of it. * * *

"Q. If there were some bartending to do he would do the bartending too, would he? A. Yes, sir.

"Q. And he did on occasions during the period of time that you have mentioned in your testimony? A. Yes, sir.

"Q. Was Mr. Winter paid anything for the service of winter keeper? A. Well, no, there was no pay only he was to get the horses the next spring starting sometime in May; had the concession of the camp. * * *

"Q. Were you in the bar premises at the Karst Ranch or Kamp on May 8, 1953? A. No, I was not. * * *

"Q. Do you know whether Mr. Winter was in your bar on May 8, 1953, at the Karst Kamp? A. Well, I think—I was not in the bar, no; I was outside.

"Q. You were outside where? A. Oh, I was about two or three hundred feet away from there piling wood and cutting wood.

218

"Q. And was Mr. Winter in the bar on that date, May 8, 1953? A. I think he was.

"Q. He was in the bar while you were outside cutting wood on that date? A. Yes, sir. * * *

"Q. The bar premises at the Karst Kamp were open of course? A. Well, yes * * *

"Q. He [Winter] was obligated to act as your winter keeper was he not, Mr. Karst? A. Well, he took care of it as the winter keeper would. If there was any snow to shovel, why, he'd maybe do it. It was up to him to do it if he wanted.

"Q. And you expected him to do it while you were absent or away from the premises? A. Yes, I had much faith in him. I knew he'd do it.

"Q. He stood in your place as to things that had to be done when you were away, is that true? A. His what?

"Q. He took your place as to things that had to be done while you were absent or away, did he? A. Yes.

"Q. Including tending the bar if anyone dropped in? A. Yes."

The evidence supplied by the six witnesses who testified on behalf of the state is ample to establish the offense of unlawfully selling beer to the named seventeen-year old boy as is alleged in the information.

In his objection to the introduction of any evidence in the case defendant's counsel also stated that, "at the time of the amending of the information in this case over the objection of the defendant the county attorney assured the court that this was a prosecution under the provisions of section 4-330, as amended." The state's brief herein denies that the county attorney so assured the trial court and we find no such statements or remarks of the county attorney in the record before us.

In State v. Tursich, 127 Mont. 504, 267 Pac. (2d) 641, 643, this court said: "In 27 Am. Jur., Indictments & Informations, section 99, page 659, it is said: 'An indictment which properly charges an offense under a statute is good, although the of-

fense charged is not the one which the prosecuting attorney had in mind when he drew the indictment * * *'. To the same effect is Capone v. United States, 7 Cir., 51 F. (2d) 609, 76 A. L. R. 1534."

Whether the defendant Winter was an employee of Peter F. ■ Karst or merely an accommodating neighborly fellow residing at the Karst Kamp and tending bar there without compensation is wholly immaterial for if he sold beer to the named minor as charged he thereby violated the law and committed the offense charged against him in the original information and also in the information as amended. See R. C. M. 1947, sections 94-35-106 and 94-35-106.1, supra.

Under the above statutes the selling to the minor was an offense without regard to whether the defendant had license to sell or not. Compare Commonwealth v. Vaughn, 101 Ky. 603, 42 S. W. 117, 45 L. R. A. 858.

Defendant's counsel contends "that the District Court did not have jurisdiction to try the defendant * * * in an original proceeding for a misdemeanor for the reason that original jurisdiction of the District Court under the Statute [section 94-35-106] which the State was prosecuting no longer existed by virtue of the passage of Chapter 71, Session Laws of 1953, which repealed all other laws in conflict therewith."

R. C. M. 1947, section 94-35-106, supra, was amended by Chapter 143, Laws of 1949, the second section whereof (section 94-35-106.) provides: "Section 2. In cases of prosecution for first offenses under this act, the justice courts and district courts of the State of Montana shall have concurrent original jurisdiction. In all other cases the district courts of the State of Montana shall have exclusive original jurisdiction for violation of the provisions of this act."

Chapter 71, Laws of 1953, enacted by the Thirty-third Legislative Assembly, 1953, R. C. M. 1947, section 4-413, fails to prescribe or fix a time whereon the act shall take effect, hence it did not take effect until July 1, 1953, under R. C. M. 1947, section 43-507, which provides: "Every statute, unless a dif-

ferent time is prescribed therein, takes effect on the first day of July of the year of its passage and approval."

The information charges and the evidence shows that the offense of which defendant stands convicted was committed on May 8, 1953, being prior to July 1, 1953, the effective date of Chapter 71, Laws of 1953.

R. C. M. 1947, section 43-514, provides: "The repeal of any law creating a criminal offense does not constitute a bar to the indictment or information and punishment of an act already committed in violation of the law so repealed, unless the intention to bar such indictment or information and punishment is expressly declared in the repealing act."

Under the provisions of R. C. M. 1947, sections 43-507 and 43-514, supra, the provisions of Chapter 71, Laws of 1953, have no application whatever to the offense for which defendant was convicted, which offense had already been committed prior to the effective date of Chapter 71, Laws of 1953.

Defendant contends that R. C. M. 1947, section 4-330, as ▇▇ ▇▇ amended by Chapter 166, Laws of 1951, repealed section 94-35-106, supra.

Chapter 166, Laws of 1951, pages 324-335, in its title and also in section 12 thereof, expressly enumerates and lists the various sections of the Codes that the legislature intended to repeal and section 12 of the Act also provides: "All acts and parts of acts in conflict herewith are hereby repealed." Had it been the intent to also repeal section 94-35-106, supra, the Act would have so stated and this it did not do. The sections of the Codes that are enumerated and listed as repealed or amended are all sections of the Montana Beer Act being Chapter 3 of Vol. 1, Revised Codes of Montana of 1947, at pages 563 to 581, containing sections 4-301 to 4-356, inclusive.

There is nothing in either the title or the Act itself to suggest that in enacting Chapter 166, Laws of 1951, it was the intent of the legislature to repeal section 94-35-106, hence if this penal statute be repealed it is only by *implication* and in this jurisdiction it is well settled that repeals by implication are

not favored. Tipton v. Sands, 103 Mont. 1, 14, 60 Pac. (2d) 662, 106 A. L. R. 474; Fletcher v. Paige, 124 Mont. 114, 119, 220 Pac. (2d) 484, 19 A. L. R. (2d) 1108.

Defendant relies very strongly upon the case of State v. Holt, 121 Mont. 459, 194 Pac. (2d) 651, decided in 1948, but the very next legislature dispelled all doubt as to its intent by promptly enacting Chapter 143, Laws of 1949, now appearing in the Cumulative Pocket Supplement to Vol. 8 of the Revised Codes of Montana of 1947, as sections 94-35-106 and 94-35-106.1, whereby original jurisdiction of the offense of selling of intoxicating liquor to any minor is expressly conferred upon the district courts of the state.

Likewise the Montana Beer Act, being section 48 of Chapter 106, Laws of 1933, as amended by section 16 of Chapter 46, Laws of the Extraordinary Session of 1933 and now R. C. M. 1947, section 4-344, expressly confers upon the district courts concurrent original jurisdiction with justice courts in prosecutions for violations of such Act.

Defendant complains of the absence of evidence as to the alcoholic content of the beer sold. When used in its ordinary acceptation and without qualification, as here, the term "beer" implies a malt liquor and an intoxicating beverage which is recognized as an article of commerce made and used in most of the European countries as well as in America. 30 Am. Jur., Intoxicating Liquors, section 8, pages 256, 257.

R. C. M. 1947, section 94-35-106, makes it a crime and fixes the penalty for selling, giving away or disposing of intoxicating liquors to any person under the age of twenty-one years and R. C. M. 1947, section 94-35-107, provides that the phrase "intoxicating liquor shall be construed to include alcohol, brandy, whiskey, rum, gin, beer, ale, porter and wine without fixing any percentage of alcohol that the said above named liquors and beverages including beer should contain in order to constitute an offense. Clearly the information herein sufficiently charges and the evidence is ample to show an offense without any showing as to the percentage of alcohol contained in the beer that

was sold and supplied to the minor named in such information.

Briffitt v. State, 58 Wis. 39, 16 N. W. 39, 40, 46 Am. Rep. 621, holds that upon the trial of the defendant charged with having sold intoxicating liquors without a license when a witness uses the word "beer" in his testimony the court will take judicial notice that the witness means a malt and an intoxicating drink. The Supreme Court of Wisconsin said:

"When the question was asked whether malt is used in ordinary beer, the court said: 'I do not think it is necessary. I think a man must be almost a driveling idiot who does not know what beer is. I do not think it necessary to prove what it is.' The charge of the court on the same subject was substantially of the same import. It was proved that the defendant had sold 'beer.' * * *

"* * * malt liquor, as ale or beer, was made and used as a beverage before the time of Herodotus, and has continued to be made and used all along down the ages, and in various countries, until the present time. At the present time we all know that this malt liquor, under the generic name of 'beer,' is made and used in most of European countries, and in our own, and is a common beverage. As long as laws for licensing the sale of intoxicating liquors have existed, brandy, whisky, gin, rum, and other alcoholic liquids have been held to be intoxicating liquors *per se;* and why? Simply because it is within the common knowledge and ordinary understanding that they are intoxicating liquors. By this rule of common knowledge courts take judicial notice that certain things are *verities,* without proof; * * * . If a witness on the stand were asked whether whisky is intoxicating, he would be apt to smile as at a joke, and an intelligent witness, when asked the same question in relation to beer, might smile with equal reason. * * *

"* * * It is true that, to a limited extent, there are other kinds of beer, or of liquor called beer, such as small beer, spruce beer, ginger beer, etc.; but such definitions are placed as remote and special, and not primary or general. So it may be said of other substances having a common name and meaning,

such as milk or tea. \* \* \* When asked to take a drink of milk or cup of tea, it would not be necessary to prove what it meant. Why is it more necessary to prove what is meant by a glass or drink of beer? When beer is called for at the bar, in a saloon or hotel, the bartender would know at once, from the common use of the word, that strong beer—a spirituous or intoxicating beer —was wanted; and if any other kind was wanted, the word would be qualified, and the particular kind would be named, as root beer or small beer, etc. When, therefore, the word 'beer' is used in court by a witness, the court will take judicial notice that it means a malt and an intoxicating liquor, or such meaning will be a presumption of fact, and in the meaning of the word itself there will be *prima facie* proof that it is malt or intoxicating liquor that is meant.

''When the witnesses in this case testified that the defendant sold to them beer, the prosecution had sufficiently proved that he had sold to them a malt and intoxicating liquor, for both qualities are implied in the word 'beer.' '' Compare 48 C. J. S., Intoxicating Liquors, section 1, page 135; People v. Rosseau, 100 Cal. App. 245, 279 Pac. 819; State v. McGregor, Iowa, 266 N. W. 22; State v. Schrader, 243 Iowa 978, 55 N. W. (2d) 232 at page 237; United States v. Standard Brewery, D. C., 260 F. 486, 487; State v. Li Fieri, 6 Boyce 597, 29 Del. 597, 102 A. 77; Moffitt v. People, 59 Colo. 406, 149 Pac. 104, 107; Hoskins v. Commonwealth, 171 Ky. 204, 188 S. W. 348; Barnett v. O'Connell, 279 App. Div. 449, 111 N. Y. S. (2d) 166, 167.

In Holmes v. Cavicchia, 29 N. J. Super 434, 102 A. (2d) 788, 789, it is said:

''As heretofore stated, the minors testified that they ordered beer by the glass and that in response to their orders Holmes served them and received payment. There is an implication that a purchaser has received that which he has ordered and paid for. [Citing authorities.]

''We are of the opinion that in this day and age where through the mediums of radio, television, magazines, newspapers and other propagandizing facilities, the public is introduced to the

sensual experiences of the advertised article and, in particular, beer and other alcoholic beverages, the listening, viewing and reading public become aware of these products quite early in life. In addition, we would expect that the minors, in the matter *sub judice,* being normally subjected to the aforementioned mediums and having been frequenters of appellants' tavern on prior occasions and being known to the bartender, were not unaware of beer nor hampered in their ready recognition that the beverage received was that advertised and generally known to be beer.

"The fact that 'beer' is presumed to contain alcohol is not a novel principle to the courts of this State. In the case of Murphy v. Inhabitants of Montclair Tp., 39 N. J. L. 673 (Sup. Ct. 1877), the issue was the alleged violation of statute prohibiting sale of 'ale, porter, beer or other malt or spirituous liquors as a beverage,' without a license. The court stated at page 675:

" 'The words "ale, porter, beer," when used in statutes relative to licenses, have no uncertain meaning. Each means a certain liquor made from malt, containing a certain percentage of alcohol.

" 'Had the state of demand charged the sale of two glasses of porter, it would hardly have been seriously argued that an assertion that it was a malt or spirituous liquor, would have been essential. But it is said that beer may mean either a malt liquor or an innocent beverage, known as spruce beer, small beer, ginger beer, etc.

" 'I think there is nothing in this, for even if the court can judicially recognize the existence of the various distinctions in the quality of these beverages, yet the word "beer," as here used, has a well-defined signification. The words "by night," in the Crimes Act, (sec. 93,) have no more a distinctly ascertained meaning than either of these words, when used as here in an act concerning licenses.

" 'As there is no need of specifying that "by night" was meant the portion of the natural light within the twilights,

(State v. Robinson, [35 N. J. L. 71] 6 Vroom [71] 73,) so, in this instance, there is no need of asserting that the word "beer" meant what the word usually implies when used in statutes to regulate the selling of malt or spirituous liquors. * * *' [Citing authorities.]

"We find decisions holding that technical proof may be required to establish the alcoholic quantity of beer where there is evidence that the beverage was 'qualified beer,' i. e., spruce beer, small beer, ginger beer, near beer, and the like but where there is no evidence that the beverage is other than that generally known as 'beer' the courts have held the implied alcoholic character to be recognized and judicially noticeable. [Citing authorities.]"

In support of his motion for a new trial the defendant filed the affidavits of his counsel and of two of the jurors who tried his case.

The affidavit of the juror Lois Lylan Schauer states that she believed the verdict of guilty so returned was contrary to the facts and the instruction; that one of the jurors, when sworn was biased and prejudiced against the defendant and that "immediately upon retiring to the jury room, such juror declared that her mind was made up." Of course at the time the jurors were allowed to retire to the jury room to consider their verdict they had heard all the evidence in the case as well as the arguments of counsel and the instructions of the court and they were in a most advantageous position to have and to express their reactions, opinions and conclusions drawn from and shown by the undisputed evidence which the state's witnesses had given during the trial.

The affidavit of the juror, Mila Church, states that one of the jurors who voted "guilty" was prejudiced against the defendant because a teen-aged son of such juror had recently been in difficulty in school because someone had sold the youth beer and that this boy's mother greatly influenced the other jurors to return a verdict of guilty. By such affidavit Juror Church plainly shows that she voted "not guilty" and that she was

doing her utmost to aid the defendant and his counsel to procure a new trial. Such affidavits so setting forth speculations, conjectures and conclusions as to why the defendant was not acquitted are clearly insufficient to warrant the granting of a new trial. Compare Le Grand v. U-Drive It Co., Mo., 247 S. W. (2d) 706, 712; McDonald v. F. W. Woolworth, 66 R. I. 488, 20 A. (2d) 250, 251; 81 C. J. S., Speculation, page 815.

Eight jurors concurring were sufficient to find a verdict in this case. R. C. M. 1947, section 94-7002. The record shows that ten jurors voted "guilty" while only two voted "not guilty." Thus, two more than the required number voted for the verdict of guilty.

In State v. Mott, 29 Mont. 292, 307, 74 Pac. 728, 733 (cited and followed in State. v. Poole, 68 Mont. 178, 194, 216 Pac. 798, and State v. Ingersoll, 88 Mont. 126, 130, 292 Pac. 250), this court said:

"In this case the district judge heard the *voir dire* examination of the juror; observed his demeanor while testifying, as well as during the trial of the case; passed upon the affidavits filed on behalf of the defendant and on the part of the state; and overruled the motion for a new trial. In the light of the statute and of the showing made upon this appeal, we cannot say the court erred.

"While it is imperative that the accused shall have a trial by an impartial jury, the mere possibility or even probability that one of the jurors was incompetent is not sufficient to overturn the verdict. After verdict the accused has the laboring oar. 'Error will not be presumed. It must be affirmatively made out.' People v. Scott, 56 Mich. 154, 22 N. W. 274. A trial having been had under the rules prescribed by law, the presumption is in favor of its validity. In passing on a motion for a new trial based upon the alleged incompetency of a juror, the lower court is called upon to exercise a sound legal discretion. In the absence of a clear showing of error in this regard, the appellate court will not interfere."

The trial judge heard the *voir dire* examination and was fa-

miliar with the conditions which obtained at the trial. The motion for a new trial and the affidavits filed therewith were insufficient to warrant a new trial under the provisions of section 94-7603, R. C. M. 1947, which section is the same as section 1181, Cal. Pen. Code. See also 23 C. J. S., Criminal Law, section 1446 b (1), page 1171, and cases cited.

In People v. Galloway, 202 Cal. 81, 259 Pac. 332, 336, the court said:

''We think the proper rule is this: That under section 1181, subd. 3, it is within the power of the trial court to grant to an accused a new trial because of misconduct of a juror whether such misconduct consists of a failure to disclose a prejudicial mind at the time he is sworn or whether such misconduct arises after he is sworn as a member of the trial jury, subject, of course, to the qualification that such misconduct will not be considered sufficient where the accused has failed to exercise diligence in the premises or has knowledge prior to the verdict of such misconduct; nor will it avail an accused when, from a consideration of the whole case, it can be seen that he has suffered no injury therefrom. * * * And as far as we can ascertain, the decisions of practically all of the states are to the same effect. Cases in states having statutes identical with our own and sustaining the conclusion herein announced are State v. Mott, 29 Mont. 292, 74 Pac. 728 * * *.''

The trial court upon the record before it did not abuse its discretion in denying the motion for a new trial.

Appellant's specifications of error have been carefully considered but we find no prejudicial error committed by the trial court. Accordingly the order denying a new trial and the judgment of conviction are affirmed.

MR. JUSTICES ANGSTMAN, ANDERSON and BOTTOMLY, concur.

MR. JUSTICE DAVIS, not participating.